In re                    )

                              )   Case No. _____

                              )

                              )   NOTICE OF *FINAL*

                              )   HEARING ON MOTION

                              )     FOR USE OF CASH COLLATERAL

                              )     TO OBTAIN CREDIT

Debtor(s)              )   *(Check One)*

YOU ARE NOTIFIED THAT:

1.   The undersigned moving party, _____, filed a Motion     For Use of Cash Collateral    To Obtain Credit *(check one)*.  A copy of the motion, which includes the statement required by Local Form #541.5, is attached.

2.   The name and service address of the moving party's attorney (or moving party, if no attorney) are:
_____.

3.   A *FINAL* HEARING on the motion WILL BE HELD ON _____ AT_____ IN _____,
Testimony will be received if offered and admissible.

4.   If you wish to object to the motion, you  must, within 14 days of the service date shown in pt. 5 below, file with the Clerk of Court (i.e., if the 5-digit portion of the Case No. begins with "3" or "4", mail to 1001 SW 5th Ave #700, Portland OR 97204; or if it begins with "6" or "7", mail to 405 E 8th Ave #2600, Eugene OR 97401):  (1) a written response which states the facts upon which you will rely, and (2) a certificate showing a copy of the response has been served on the U.S. Trustee and the party named in pt. 2 above.

5.   On _____ copies of  this notice and the motion were served pursuant to FRBP 7004 on the debtor(s); any debtor's attorney; any trustee; any trustee's attorney; members of any committee elected pursuant to 11 U.S.C. §705; any creditors' committee chairperson [or, if none serving, on all creditors listed on the list filed pursuant to FRBP 1007(d)]; any creditors' committee attorney; the U.S. Trustee; and all affected lien holders whose names and addresses used for service are as follows:

_____           
Signature of Moving Party or Attorney                      OSB #
_____
(If debtor is movant) Debtor's Address & Taxpayer ID#(s) (last 4 digits)

541 (6/1/15)

Laura J. Walker, OSB No. 794329
E-mail address: lwalker@cablehuston.com
Donald J. Koehler II, OSB No. 130313
E-mail address: dkoehler@cablehuston.com
CABLE HUSTON LLP
1001 SW 5th Avenue, Suite 2000
Portland, OR 97204-1136
Telephone: (503) 224-3092
Facsimile: (503) 224-3176

    Of Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| In re:<br><br>**PACIFIC RECYCLING, INC.**<br><br>Debtor. | Case No. 15-62925-fra11<br><br>**DEBTOR'S MOTION FOR ORDER AUTHORIZING SECURED CREDIT**<br><br>EXPEDITED HEARING REQUESTED |

Pacific Recycling, Inc., Debtor and Debtor-in-Possession in this Chapter 11 case (herein referred to as "Debtor), hereby submits this motion (the "Motion") for an order authorizing Debtor to obtain secured credit. Debtor proposes to enter into a line of credit agreement with Calbag Metals Co. ("Calbag"), secured by a lien on post-petition inventory, proceeds from inventory sales and a new bank account to be established with the proceeds of such sales. The line of credit will be for a maximum of $150,000.00 and will accrue interest at 7% per annum. The line of credit will be used to purchase non-ferrous scrap metal for sale to Calbag and to pay certain operating expenses. Calbag Metals will purchase the non-ferrous scrap metal from Debtor at market prices. The proposed line of credit will not affect existing liens on inventory. The proposed financing arrangement is explained in more detail below.

Page 1 –   **DEBTOR'S MOTION FOR ORDER AUTHORIZING SECURED CREDIT**

## LBR 4001-1(c) Statement

Pursuant to the requirements of LBR 4001-1, Debtor states that the agreement with Calbag contains a provision that would give Calbag a super-priority administrative expense status under Section 364(c)(1) of the Bankruptcy Code for all amounts extended by Calbag under and pursuant to the Financing Agreement. Calbag's security interest under the Financing Agreement shall be a fully perfected first priority lien on all funds in the Credit Line Bank Account and the post-petition inventory under Section 364(c)(2) of the Bankruptcy Code. This provision is necessary because Calbag is not an existing creditor. The funds being extended by Calbag under the Financing Agreement will be used as purchase money for new inventory of non-ferrous scrap metal for sale exclusively to Calbag. Calbag's lien will only attach to new inventory and funds provided by Calbag and will not attach to any existing collateral. Existing creditors will not be negatively affected by granting of the lien status.

## JURISDICTION

On August 27, 2015, (the "Petition Date"), Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Code"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. 157(b)(2). Debtor has provided notice of this motion to the Creditors Committee, the ECF parties and the Office of the United States Trustee.

## BACKGROUND

Debtor operates a metal recycling center in Eugene, Oregon (the "Recycling Center") and two satellite metal recycling yards located in Albany and Salem, Oregon (the "Recycling Yards"). Debtor is in possession of the Recycling Center and Recycling Yards, and will continue to operate and manage them as a Debtor-in-Possession.

Banner Bank ("Banner"), Strategic Funding Source, Inc. and/or VFI (collectively referred to as "the Secured Creditors") claim or may claim an interest in Debtor's cash collateral, prepetition inventory and accounts receivable. Debtor is currently engaged in discussions with

Banner regarding a cash collateral agreement to process the existing, pre-petition inventory. Debtor would be allowed to retain a portion of the proceeds from the liquidation of pre-petition inventory to cover a portion of its operating costs. If the parties iron out the budget and other terms, a separate motion will be submitted to authorize use of cash collateral to pay expenses associated with processing the pre-petition inventory and pay the net proceeds from the inventory sales to Banner. In order to purchase new inventory and continue its operations, Debtor needs additional credit.

Debtor's inventory is obtained from parties delivering loads of scrap metal to the Recycling Center or the Recycling Yards. These parties are paid for their scrap metal in cash or on a COD basis. Debtor also obtains scrap metal inventory from various customers or business accounts using "drop boxes" which are delivered to the business locations. When the drop box is full of scrap metal, Debtor is notified and goes to the business and retrieves the full drop box of scrap metal. The customers who utilize drop boxes are generally paid either weekly or monthly after the contents are weighed and invoices are prepared. Debtor estimates that its post-petition inventory purchases will be $67,500 per week going forward.

Debtor has determined that it would not be practical to use cash collateral from the sale of pre-petition inventory to pay ongoing operating expenses in full, because the combined balance owing to the Secured Creditors exceeds the value of the existing inventory and cash collateral and Debtor is unable to offer a substitute lien on unencumbered property or other adequate protection.

## RELIEF REQUESTED

Debtor seeks an interim order (the "Order") authorizing Debtor to obtain secured credit, and to continue to pay all necessary operating expenses of the Recycling Center and Recycling Yards on a temporary basis for the:

(a) maintenance and preservation of its assets;

(b) continued operation of its business; and

(c) purchase of replacement inventory and supplies to operate the business.

Page 3 –   **DEBTOR'S MOTION FOR ORDER AUTHORIZING SECURED CREDIT**

Pursuant to Section 364(c) and FRBP 4001, a proposed form of Order is attached hereto as Exhibit 2. After a final hearing held pursuant to FRBP 4001(c)(1)(C)(2), Debtor requests a final order authorizing Debtor to continue the financing arrangement during the pendency of this Chapter 11 case.

## BASIS AND JUSTIFICATION FOR RELIEF

Section 364(c) of the Bankruptcy Code provides that "the court , after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; . . . ."  11 USC §364(c); *Sherman v. Harbin,* 486 F3d 510, 521 (9th Cir 2007).  Section 364(c) of the Bankruptcy Code provides "incentives for creditors to extend credit in the post-petition period." *In re Zech*, 185 BR 334, 337 (D Neb 1995)(citations omitted).  "The power of the court to authorize the incurring of indebtedness with a priority over existing indebtedness is well recognized, with and without security." *Id.*

### A.    *Proposed Use of Secured Credit*

Calbag Metals Co. ("Calbag") has agreed to provide Debtor with a credit line in the amount of $150,000 on the terms described below.  The line of credit will be secured by a lien on post-petition inventory of non-ferrous scrap metal purchased by Debtor, all materials resulting from the processing of that inventory, and a separate bank account (the "Credit Line Bank Account") to be established by Debtor with proceeds of the credit line.  A copy of the proposed Exclusive Supply and Financing Agreement (the "Financing Agreement") is attached hereto as Exhibit 1.

The material terms of the Calbag line of credit are as follows:

1.    Line of credit in the amount of $150,000;

2.    The term of the line of credit will be until December 31, 2016;

3.       Interest on the outstanding balance of the credit line will accrue at the rate of seven percent (7%) per annum and shall be payable monthly in arrears on or before the fifth business day of each calendar month;

4.       All credit line advances will be deposited and kept in the Credit Line Bank Account;

5.       Calbag will have a first, perfected security interest in all funds in the Credit Line Bank Account, and will have access to all records and transactions in that account;

6.       Debtor may use the line of credit to pay the costs of purchasing non-ferrous metal inventory ("New Inventory") pursuant to purchase orders from Calbag, processing and shipping of the New Inventory to Calbag, and transferring specified amounts to Debtor's general operating bank account following each payment made by Calbag for its purchases of New Inventory;

7.       All New Inventory will be kept separate and not comingled with any other inventory of Debtor; and

8.       Calbag will purchase all New Inventory from Debtor at market rates.

Debtor's management has investigated other sources of credit, and in its sound business judgment, the offer of credit from Calbag is the best offer available to Debtor.

**B.**    ***Approval of Secured Credit Will Not Affect Secured Creditors' Liens***

The proposed lien to be granted to Calbag will only attach to post-petition non-ferrous scrap metal inventory, processed materials and proceeds from the sale of those goods and the Credit Line Bank Account. The Secured Creditors' liens on pre-petition inventory, cash collateral and accounts receivable will be unaffected by Calbag's lien.

**C.**    ***Good Cause Exists for Approval of the Motion***

The Secured Creditors' liens on the existing inventory restrict Debtor's ability to process its current inventory. In order to continue processing and replenishing inventory of scrap metal, Debtor's reorganization requires access to working capital and specifically, access to cash on hand. The Secured Creditors' liens on the existing inventory, cash collateral and accounts

Page 5 –   **DEBTOR'S MOTION FOR ORDER AUTHORIZING SECURED CREDIT**

receivable require Debtor to obtain a separate source of financing to enable it to continue in operation. If Debtor does not obtain immediate financing, the reorganization cannot succeed. Debtor has attempted to obtain sufficient unsecured financing, but has been unable to do so.

Good cause exists for approval of this Motion and for entry of the Order attached as hereto as Exhibit 2. Entry of the Order will permit Debtor to continue operating the Recycling Center and Recycling Yards, and to maintain the value of the Property, thereby increasing the probability of a successful reorganization. If Debtor's request to obtain secured credit is not approved, Debtor, the Secured Creditors, and the bankruptcy estate will suffer immediate and irreparable harm. Debtor will be working with Banner bank and other lienholders to liquidate pre-petition inventory over the next 60 days, but Debtor needs additional financing to purchase new inventory and continue its operations. Debtor will open a separate debtor-in-possession account (the Credit Line Bank Account) to ensure proper recordkeeping regarding its use of the secured credit and the inventory and proceeds resulting therefrom.

### D. Debtor Requests Approval of the Full Line of Credit Under the Interim Order

Debtor needs immediate access to the full amount of the line of credit from Calbag for Debtor's continued operations. The outstanding balance on the line of credit will not be a static number. The amount owed under the line of credit will increase as Debtor uses the line of credit to purchase inventory, and the line of credit will decrease as inventory is sold to Calbag. There will always be a certain amount of new inventory on site, awaiting processing and shipment to Calbag, as Debtor gets truckloads ready to go out and scrap deliveries are made on a daily basis. Debtor is requesting that the court approve the full line of credit of $150,000 under the interim order to give Debtor a better likelihood of success in its reorganization.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

Page 6 – **DEBTOR'S MOTION FOR ORDER AUTHORIZING SECURED CREDIT**



**WHEREFORE**, Debtor respectfully requests that the Court authorize Debtor to obtain secured debt pursuant to 11 USC §364(c) and approve the terms of the agreement with Calbag which is attached hereto as Exhibit 1.

DATED this 15th day of September, 2015.

CABLE HUSTON LLP

By: */s/ Laura J. Walker*
    Laura J. Walker, OSB No. 794329
    Donald J. Koehler II, OSB No. 130313
    Of Attorneys for Debtor

## EXCLUSIVE SUPPLY AND FINANCINGAGREEMENT

This Exclusive Supply and Financing Agreement (this "Agreement"), dated for reference purposes as of September 14, 2015, is made by and between Calbag Metals Co. ("Calbag") and Pacific Recycling, Inc. ("PRI"), as debtor in possession in the chapter 11 case pending in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court") under Case No. 15-62925-fra11 (the "Bankruptcy Case").

## RECITALS

PRI desires to sell to Calbag, and Calbag desires to purchase from PRI, on and subject to the terms and conditions set forth in this Agreement, all non-ferrous scrap metal products of PRI, processed and unprocessed, that are acquired by PRI after the date of the Agreement other than those products that are listed on Calbag's "Do Not Buy" list (as it is may be amended by Calbag from time to time in its sole discretion) and those products that are specifically identified by Calbag from time to time as ineligible for purchase under this Agreement (collectively, "Non-Ferrous Metal" or "New Inventory"). In order to enable PRI to buy and ship New Inventory as contemplated by this Agreement, PRI requires additional working capital for that purpose. To help fulfill this need, Calbag has agreed to provide PRI, on and subject to the terms and conditions set forth in this Agreement, a secured revolving line of credit facility (the "Credit Line") in a principal amount up to but not exceeding $150,000.

## AGREEMENT

For and in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  <u>Definitions</u>.  All capitalized terms shall have the meanings given to them in this Agreement.

2.  <u>New Inventory Sales and Purchases</u>

    (a)  Except as otherwise provided in this Agreement, PRI agrees to sell exclusively to Calbag, and Calbag agrees to purchase from PRI, all Non-Ferrous Metal.  New Inventory sold to Calbag under this Agreement will, in each case, be processed or unprocessed, as the parties may agree and as stated in the purchase order.

    (b)  Calbag will pay PRI Market Prices for all Non-Ferrous Metal that Calbag purchases under this Agreement.  As used herein, "Market Prices" means those prices offered by Calbag to its suppliers of similar size and circumstance at the time that PRI delivers Non-Ferrous Metal to Calbag under this Agreement.  Should the parties disagree on a Market Price for Non-Ferrous Metal that is part of a specific delivery, and if PRI has an offer from a scrap processor of reasonable size and standing that is at least five percent (5%) higher than the Market Price offered by Calbag for that Non-Ferrous Metal, then PRI will give Calbag the opportunity to match the other scrap processor's offered price.  If Calbag declines to match the other scrap

- 1 -

Exhibit 1
Page 1 of 5

Case 15-62925-fra11    Doc 37    Filed 09/15/15

processor's price, then PRI may sell the Non-Ferrous Metal from that delivery to the other scrap processor at the price offered by the other scrap processor.

(c)     All sales to Calbag under this Agreement will be delivered FOB at Calbag's facility in Portland, Oregon.

(d)     Payment shall be due PRI upon delivery to Calbag. Unless otherwise agreed in writing by Calbag, all payments by Calbag for purchases of Non-Ferrous Metal shall be made to PRI by wire transfer to the new, separate DIP bank account to be established by PRI under this Agreement (the "Credit Line Bank Account").

(e)     Calbag will make orders for New Inventory no less than once every seven (7) days. Calbag will provide its first purchase order upon satisfaction of the conditions set forth in Section 4 below. Deliveries of New Inventory to Calbag shall be on a schedule agreed to by the parties.

(f)     PRI will furnish to Calbag such records and information respecting PRI's transactions relating to Non-Ferrous Metal as Calbag may from time to time reasonably request.

3.     Financing

(a)     Calbag will, upon the terms and conditions hereof, make loans to PRI under the Credit Line from time to time during the period from the date of this Agreement until the earlier of December 31, 2016 or the occurrence of an Event of Default (as defined in Section 5(a) below) (the "Termination Date"), provided that at no time will the unpaid principal amount outstanding under the Credit Line exceed the lesser of (i) $150,000 and (ii) as at the date of determination, the sum of the value of PRI's New Inventory (as determined by PRI's actual cost) then on hand and the unrestricted debit balance in the Credit Line Bank Account.  PRI may borrow, pay down and re-borrow on the Credit Line.  Subject to the provisions of Section 3(c) below for Brokered Transactions, PRI will request advances under the Credit Line only as reasonably necessary to enable it to buy Non-Ferrous Metal, ship New Inventory to Calbag under this Agreement or make payments required to be made to Calbag under this Agreement.

(b)     All Credit Line advances will be deposited and kept only in the Credit Line Bank Account. Unless otherwise agreed by Calbag in writing and subject to the provisions of Section 3(c) below for Brokered Transactions, PRI shall not withdraw any funds from the Credit Line Bank Account except for the purposes of (i) buying Non-Ferrous Metal, (ii) shipping New Inventory to Calbag, (iii) making payments required to be made to Calbag under this Agreement, and (iv) transferring to PRI's general operating bank account following each payment made by Calbag for purchases of New Inventory an amount not to exceed the excess of the purchase price paid by Calbag for such shipment over the total cost to PRI of acquiring and shipping such New Inventory to Calbag. Calbag will have complete and real on-line access to all records relating to transactions in the Credit Line Bank Account.

**Exhibit 1**
**Page 2 of 5**

(c)     Except as otherwise provided in the next sentence, the proceeds of Credit Line advances will be used by PRI to buy Non-Ferrous Metal, ship New Inventory to Calbag and make payments required to be made to Calbag under this Agreement, and for no other purpose. Notwithstanding the limitations in the preceding sentence on PRI's use of Credit Line proceeds, if agreed by Calbag in writing, PRI may, from time to time, obtain loans under the Credit Line for purposes of buying Non-Ferrous Metal to be shipped to customers other than Calbag in transactions brokered by PRI ("Brokered Transactions").

(d)     PRI shall provide Calbag a regular detailed record of all purchases of scrap metal with the Credit Line proceeds. This report will provide such details as Calbag may require. All New Inventory purchased with proceeds of the Credit Line will be kept separate and not comingled with any other inventory of PRI. Calbag or its agents may inspect such New Inventory at any time.  Calbag and PRI will agree on the exact content and schedule of these reports within three (3) business days after the first Credit Line advance is made hereunder.

(e)     Any part of the balance outstanding on the Credit Line may be prepaid by PRI at any time without premium or penalty.

(f)     Interest on the outstanding and unpaid principal amount of loans made under  the Credit Line will accrue at the rate of seven percent (7%) per annum and be payable monthly in arrears on or before the fifth business day of each calendar month.

(g)     PRI will pay to Calbag from time to time all reasonable out-of-pocket costs and expenses (including reasonable fees of outside counsel) of Calbag in connection with the preparation, negotiation, approval, execution, delivery, administration, modification, amendment, waiver, enforcement (whether or not an Event of Default has occurred or is continuing and whether enforcement is made through negotiations, legal proceedings or otherwise), and termination of this Agreement and of the other documents to be delivered hereunder and the transactions contemplated hereby and thereby and the fulfillment or attempted fulfillment of conditions precedent hereunder ("Expenses"). Calbag's Expenses will be paid by PRI from time to time promptly after PRI is authorized to pay them under the terms of the Approval Order (as defined in Section 4(a) below).

(h)     In connection with each Brokered Transaction, PRI will within two (2) business days after PRI ships the brokered product to its customer, (i) pay Calbag a fee in an amount to be agreed by the parties but not to exceed fifty percent (50%) of PRI's gross margin on such sale, and (ii) pay down on the Credit Line an amount not less than the amount advanced by Calbag to enable PRI to buy the brokered product.

(i)     To secure the payment and performance in full of all obligations, indebtedness and liabilities of PRI to Calbag under this Agreement (whether for loans made under the Credit Line or for sales of New Inventory and whenever arising) (collectively, as at any date of determination, the "Obligations"), PRI hereby grants to Calbag a security interest in all of PRI's rights and interests in and to New Inventory and the Credit Line Bank Account, in each case, wherever located and whether now owned or hereafter acquired or arising, and in all proceeds thereof. Calbag's security interest in such collateral shall at all times have first priority

and no such collateral shall be subject to any right or claim of any third party or any adverse lien, security interest or other encumbrance except for Calbag's security interest.

(j)     On the Termination Date, the entire unpaid principal balance of the loans made under the Credit Line, all accrued but unpaid interest thereon and all other Obligations of PRI to Calbag then outstanding shall be paid in full.

4.     <u>Conditions Precedent</u>.  This Agreement and the obligations of the parties hereunder are subject to the satisfaction or waiver by Calbag of each of the following:

(a)     The Bankruptcy Court will have entered an order in form and substance satisfactory to Calbag (the "<u>Approval Order</u>"), which order shall be in full force and effect and shall not be subject to an appeal, (i) approving this Agreement and authorizing and approving the transactions contemplated hereby, (ii) granting super-priority administrative expense status under section 364(c)(1) of the Bankruptcy Code for all Obligations, (iii) providing that PRI's security interest under this Agreement is a fully perfected first priority lien under section 364(c)(2) of the Bankruptcy Code, (iv) lifting the automatic stay as necessary to permit PRI to perform its obligations under this Agreement and to permit Calbag to exercise its rights and remedies under Section 5(b) below upon the occurrence of an Event of Default provided that Calbag must file in the Bankruptcy Case a notice before exercising such rights and remedies, and (v) authorizing PRI to reimburse Calbag for its Expenses from time to time under a procedure whereby Calbag will file in the Bankruptcy Case a notice with summary documentation (which may be redacted in part) and PRI will be authorized to pay the amounts set forth in such notice unless a party in interest files an objection within 14 days after such notice if filed.

(b)     PRI will have delivered to Calbag such other documents as Calbag or its counsel may reasonably require (including a deposit account control agreement).

5.     <u>Events of Default and Remedies</u>.

(a)     <u>Events of Default</u>.  The occurrence of any of the following will constitute an event of default under this Agreement (each an "<u>Event of Default</u>"): (i) the failure of PRI to pay any of the Obligations relating to the Credit Line in cash in full when due; (ii) breach by PRI of any of its Obligations under this Agreement or the Approval Order and such breach is not remedied within seven (7) days after written notice is given by Calbag to PRI; (iii) any representation or warranty made by PRI to Calbag in connection with this Agreement is untrue, incorrect, incomplete or misleading in any material respect on or as of the date made; (iv) the occurrence of any event that Calbag reasonably determines will have a material adverse impact on PRI's ability to timely pay or perform the Obligations; or (v) the entry of an order of the Bankruptcy Court confirming a plan, converting or dismissing PRI's chapter 11 case, or appointing a trustee or an examiner with powers to direct or control PRI's business.

(b)     <u>Remedies</u>.  Upon the occurrence of an Event of Default, Calbag may, at any time and without any other notice to or demand on PRI, (i) terminate the Line of Credit whereby Calbag's obligations to make further loans shall terminate, (ii) declare all or any portion of the Obligations immediately due and payable, without presentment, demand, protest or further

- 4 -

Exhibit 1
Page 4 of 5

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| In re: | Case No. 15-62925-fra11 |
| **PACIFIC RECYCLING, INC.,** | **[PROPOSED] INTERIM ORDER APPROVING EXCLUSIVE SUPPLY AND FINANCING AGREEMENT AND SCHEDULING A FINAL HEARING** |
| Debtor. | |

THIS MATTER having come before the Court upon Debtor's Motion for Order Authorizing Secured Credit; notice of the Motion having been given pursuant to Bankruptcy Rule 4001, and the Court having heard and considered the arguments of counsel at the preliminary hearing on September ___, 2015. The Court being duly advised in the premises finds good cause therefore and that it would be in the best interests of the Debtor and the creditors;

IT IS HEREBY ORDERED:

1.      The motion is granted on an interim basis, subject to the terms set forth herein, and the terms and provisions of the Exclusive Supply and Financing Agreement dated September 14, 2015 (in the form attached hereto as Exhibit 1, the "Agreement") between the Debtor and Calbag Metals Co. ("Calbag") which are approved in all respects.  The Debtor and Calbag may

Page 1 –   **[PROPOSED] INTERIM ORDER APPROVING EXCLUSIVE SUPPLY AND FINANCING AGREEMENT AND SCHEDULING A FINAL HEARING**

Exhibit 2
Page 1 of 8

enter into any non-material amendments, consents, waivers or modifications to the Agreement, in each case without the need for further notice and hearing or any order of this Court; provided, however, that no such amendment or waiver shall increase the amount of the Credit Line limit. This Interim Order shall be valid, binding on all parties and fully effective immediately upon entry notwithstanding Bankruptcy Rules 4001(a)(4) and 6004(h).

2.      Calbag shall be granted super-priority administrative expense status under Section 364(c)(1) of the Bankruptcy Code for all amounts extended by Calbag under and pursuant to the Financing Agreement and Calbag's security interest under the Financing Agreement shall be a fully perfected first priority lien on post-petition inventory and the Credit Line Bank Account, under Section 364(c)(2) of the Bankruptcy Code.

3.      The automatic stay is lifted to the extent necessary for Debtor to perform its obligations under the Financing Agreement and to permit Calbag to exercise its rights and remedies with respect to the credit line extended under the Financing Agreement, provided that Calbag must file a notice with this Court prior to exercising any such rights and remedies.

4.      Debtor is authorized to reimburse Calbag for Calbag's out-of-pocket costs and expenses from time to time, after notice to this Court by Calbag of the amount of reimbursement being sought and summary documentation thereof, unless a party in interest files an objection within fourteen (14) days of the filing of such notice.

5.      This Interim Order is entered pursuant to Section 364 of the Bankruptcy Code and, as such, Calbag is entitled to all of the protections afforded by Section 364€of the Bankruptcy Code in the event that any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed.

6.      Debtor is authorized to take all actions that are reasonably necessary or desirable to perform its obligations under the Agreement and implement the terms of this Interim Order.

7.      Except as otherwise provided herein, (a) the protections afforded to Calbag under this Interim Order, and any actions taken pursuant hereto, shall survive the entry of an order

Page 2 –  **[PROPOSED] INTERIM ORDER APPROVING EXCLUSIVE SUPPLY AND FINANCING AGREEMENT AND SCHEDULING A FINAL HEARING**

dismissing this case or converting this chapter 11 case to a case under chapter 7, and (b) the liens and superpriority administrative expense claim granted to Calbag under this Interim Order shall continue in this chapter 11 case, in any superseding chapter 7 case or after any such dismissal.

8.      This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Interim Order.

9.      A final hearing on Debtor's Motion for Order Authorizing Secured Debt is set for September 30, 2015 at 11:00 a.m. in this court.

10.     The provisions of this Interim Order shall remain in full force and effect pending the entry of a final order authorizing Debtor to obtain secured credit unless modified or vacated by some other subsequent order of this Court.

### #

I certify I have complied with the requirements of LBR 9021-1(a)(2)(A).


Presented by:

CABLE HUSTON LLP


By: */s/ Laura J. Walker*
    Laura J. Walker, OSB No. 794329
    lwalker@cablehuston.com
    Donald J. Koehler II, OSB No. 131313
    dkoehler@cablehuston.com
    1001 SW 5th Avenue, Suite 2000
    Portland, OR 97204-1136
    Telephone:(503) 224-3092
    Facsimile: (503) 224-3176

       Attorneys for Debtor

cc:     List of Interested Parties
      US Trustee
      USTPRegion18.PL.ECF@usdoj.gov
4833-3842-9992, v. 1


Page 3 –   **[PROPOSED] INTERIM ORDER APPROVING EXCLUSIVE SUPPLY AND**
         **FINANCING AGREEMENT AND SCHEDULING A FINAL HEARING**

**Exhibit 2**
**Page 3 of 8**

Case 15-62925-fra11    Doc 37    Filed 09/15/15

# EXCLUSIVE SUPPLY AND FINANCINGAGREEMENT

This Exclusive Supply and Financing Agreement (this "Agreement"), dated for reference purposes as of September 14, 2015, is made by and between Calbag Metals Co. ("Calbag") and Pacific Recycling, Inc. ("PRI"), as debtor in possession in the chapter 11 case pending in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court") under Case No. 15-62925-fra11 (the "Bankruptcy Case").

## RECITALS

PRI desires to sell to Calbag, and Calbag desires to purchase from PRI, on and subject to the terms and conditions set forth in this Agreement, all non-ferrous scrap metal products of PRI, processed and unprocessed, that are acquired by PRI after the date of the Agreement other than those products that are listed on Calbag's "Do Not Buy" list (as it is may be amended by Calbag from time to time in its sole discretion) and those products that are specifically identified by Calbag from time to time as ineligible for purchase under this Agreement (collectively, "Non-Ferrous Metal" or "New Inventory"). In order to enable PRI to buy and ship New Inventory as contemplated by this Agreement, PRI requires additional working capital for that purpose. To help fulfill this need, Calbag has agreed to provide PRI, on and subject to the terms and conditions set forth in this Agreement, a secured revolving line of credit facility (the "Credit Line") in a principal amount up to but not exceeding $150,000.

## AGREEMENT

For and in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     <u>Definitions</u>.  All capitalized terms shall have the meanings given to them in this Agreement.

2.     <u>New Inventory Sales and Purchases</u>

    (a)    Except as otherwise provided in this Agreement, PRI agrees to sell exclusively to Calbag, and Calbag agrees to purchase from PRI, all Non-Ferrous Metal.  New Inventory sold to Calbag under this Agreement will, in each case, be processed or unprocessed, as the parties may agree and as stated in the purchase order.

    (b)    Calbag will pay PRI Market Prices for all Non-Ferrous Metal that Calbag purchases under this Agreement.  As used herein, "Market Prices" means those prices offered by Calbag to its suppliers of similar size and circumstance at the time that PRI delivers Non-Ferrous Metal to Calbag under this Agreement.  Should the parties disagree on a Market Price for Non-Ferrous Metal that is part of a specific delivery, and if PRI has an offer from a scrap processor of reasonable size and standing that is at least five percent (5%) higher than the Market Price offered by Calbag for that Non-Ferrous Metal, then PRI will give Calbag the opportunity to match the other scrap processor's offered price.  If Calbag declines to match the other scrap

processor's price, then PRI may sell the Non-Ferrous Metal from that delivery to the other scrap processor at the price offered by the other scrap processor.

(c)     All sales to Calbag under this Agreement will be delivered FOB at Calbag's facility in Portland, Oregon.

(d)     Payment shall be due PRI upon delivery to Calbag. Unless otherwise agreed in writing by Calbag, all payments by Calbag for purchases of Non-Ferrous Metal shall be made to PRI by wire transfer to the new, separate DIP bank account to be established by PRI under this Agreement (the "Credit Line Bank Account").

(e)     Calbag will make orders for New Inventory no less than once every seven (7) days. Calbag will provide its first purchase order upon satisfaction of the conditions set forth in Section 4 below. Deliveries of New Inventory to Calbag shall be on a schedule agreed to by the parties.

(f)     PRI will furnish to Calbag such records and information respecting PRI's transactions relating to Non-Ferrous Metal as Calbag may from time to time reasonably request.

3.     Financing

(a)     Calbag will, upon the terms and conditions hereof, make loans to PRI under the Credit Line from time to time during the period from the date of this Agreement until the earlier of December 31, 2016 or the occurrence of an Event of Default (as defined in Section 5(a) below) (the "Termination Date"), provided that at no time will the unpaid principal amount outstanding under the Credit Line exceed the lesser of (i) $150,000 and (ii) as at the date of determination, the sum of the value of PRI's New Inventory (as determined by PRI's actual cost) then on hand and the unrestricted debit balance in the Credit Line Bank Account. PRI may borrow, pay down and re-borrow on the Credit Line. Subject to the provisions of Section 3(c) below for Brokered Transactions, PRI will request advances under the Credit Line only as reasonably necessary to enable it to buy Non-Ferrous Metal, ship New Inventory to Calbag under this Agreement or make payments required to be made to Calbag under this Agreement.

(b)     All Credit Line advances will be deposited and kept only in the Credit Line Bank Account. Unless otherwise agreed by Calbag in writing and subject to the provisions of Section 3(c) below for Brokered Transactions, PRI shall not withdraw any funds from the Credit Line Bank Account except for the purposes of (i) buying Non-Ferrous Metal, (ii) shipping New Inventory to Calbag, (iii) making payments required to be made to Calbag under this Agreement, and (iv) transferring to PRI's general operating bank account following each payment made by Calbag for purchases of New Inventory an amount not to exceed the excess of the purchase price paid by Calbag for such shipment over the total cost to PRI of acquiring and shipping such New Inventory to Calbag. Calbag will have complete and real on-line access to all records relating to transactions in the Credit Line Bank Account.

**Exhibit 2**
**Page 5 of 8**

(c)     Except as otherwise provided in the next sentence, the proceeds of Credit Line advances will be used by PRI to buy Non-Ferrous Metal, ship New Inventory to Calbag and make payments required to be made to Calbag under this Agreement, and for no other purpose. Notwithstanding the limitations in the preceding sentence on PRI's use of Credit Line proceeds, if agreed by Calbag in writing, PRI may, from time to time, obtain loans under the Credit Line for purposes of buying Non-Ferrous Metal to be shipped to customers other than Calbag in transactions brokered by PRI ("Brokered Transactions").

(d)     PRI shall provide Calbag a regular detailed record of all purchases of scrap metal with the Credit Line proceeds. This report will provide such details as Calbag may require. All New Inventory purchased with proceeds of the Credit Line will be kept separate and not comingled with any other inventory of PRI. Calbag or its agents may inspect such New Inventory at any time. Calbag and PRI will agree on the exact content and schedule of these reports within three (3) business days after the first Credit Line advance is made hereunder.

(e)     Any part of the balance outstanding on the Credit Line may be prepaid by PRI at any time without premium or penalty.

(f)     Interest on the outstanding and unpaid principal amount of loans made under the Credit Line will accrue at the rate of seven percent (7%) per annum and be payable monthly in arrears on or before the fifth business day of each calendar month.

(g)     PRI will pay to Calbag from time to time all reasonable out-of-pocket costs and expenses (including reasonable fees of outside counsel) of Calbag in connection with the preparation, negotiation, approval, execution, delivery, administration, modification, amendment, waiver, enforcement (whether or not an Event of Default has occurred or is continuing and whether enforcement is made through negotiations, legal proceedings or otherwise), and termination of this Agreement and of the other documents to be delivered hereunder and the transactions contemplated hereby and thereby and the fulfillment or attempted fulfillment of conditions precedent hereunder ("Expenses"). Calbag's Expenses will be paid by PRI from time to time promptly after PRI is authorized to pay them under the terms of the Approval Order (as defined in Section 4(a) below).

(h)     In connection with each Brokered Transaction, PRI will within two (2) business days after PRI ships the brokered product to its customer, (i) pay Calbag a fee in an amount to be agreed by the parties but not to exceed fifty percent (50%) of PRI's gross margin on such sale, and (ii) pay down on the Credit Line an amount not less than the amount advanced by Calbag to enable PRI to buy the brokered product.

(i)     To secure the payment and performance in full of all obligations, indebtedness and liabilities of PRI to Calbag under this Agreement (whether for loans made under the Credit Line or for sales of New Inventory and whenever arising) (collectively, as at any date of determination, the "Obligations"), PRI hereby grants to Calbag a security interest in all of PRI's rights and interests in and to New Inventory and the Credit Line Bank Account, in each case, wherever located and whether now owned or hereafter acquired or arising, and in all proceeds thereof. Calbag's security interest in such collateral shall at all times have first priority

- 3 -

Exhibit 2
Page 6 of 8

Case 15-62925-fra11     Doc 37     Filed 09/15/15

and no such collateral shall be subject to any right or claim of any third party or any adverse lien, security interest or other encumbrance except for Calbag's security interest.

(j)     On the Termination Date, the entire unpaid principal balance of the loans made under the Credit Line, all accrued but unpaid interest thereon and all other Obligations of PRI to Calbag then outstanding shall be paid in full.

4.     <u>Conditions Precedent</u>.  This Agreement and the obligations of the parties hereunder are subject to the satisfaction or waiver by Calbag of each of the following:

(a)     The Bankruptcy Court will have entered an order in form and substance satisfactory to Calbag (the "<u>Approval Order</u>"), which order shall be in full force and effect and shall not be subject to an appeal, (i) approving this Agreement and authorizing and approving the transactions contemplated hereby, (ii) granting super-priority administrative expense status under section 364(c)(1) of the Bankruptcy Code for all Obligations, (iii) providing that PRI's security interest under this Agreement is a fully perfected first priority lien under section 364(c)(2) of the Bankruptcy Code, (iv) lifting the automatic stay as necessary to permit PRI to perform its obligations under this Agreement and to permit Calbag to exercise its rights and remedies under Section 5(b) below upon the occurrence of an Event of Default provided that Calbag must file in the Bankruptcy Case a notice before exercising such rights and remedies, and (v) authorizing PRI to reimburse Calbag for its Expenses from time to time under a procedure whereby Calbag will file in the Bankruptcy Case a notice with summary documentation (which may be redacted in part) and PRI will be authorized to pay the amounts set forth in such notice unless a party in interest files an objection within 14 days after such notice if filed.

(b)     PRI will have delivered to Calbag such other documents as Calbag or its counsel may reasonably require (including a deposit account control agreement).

5.     <u>Events of Default and Remedies</u>.

(a)     <u>Events of Default</u>.  The occurrence of any of the following will constitute an event of default under this Agreement (each an "<u>Event of Default</u>"): (i) the failure of PRI to pay any of the Obligations relating to the Credit Line in cash in full when due; (ii) breach by PRI of any of its Obligations under this Agreement or the Approval Order and such breach is not remedied within seven (7) days after written notice is given by Calbag to PRI; (iii) any representation or warranty made by PRI to Calbag in connection with this Agreement is untrue, incorrect, incomplete or misleading in any material respect on or as of the date made; (iv) the occurrence of any event that Calbag reasonably determines will have a material adverse impact on PRI's ability to timely pay or perform the Obligations; or (v) the entry of an order of the Bankruptcy Court confirming a plan, converting or dismissing PRI's chapter 11 case, or appointing a trustee or an examiner with powers to direct or control PRI's business.

(b)     <u>Remedies</u>.  Upon the occurrence of an Event of Default, Calbag may, at any time and without any other notice to or demand on PRI, (i) terminate the Line of Credit whereby Calbag's obligations to make further loans shall terminate, (ii) declare all or any portion of the Obligations immediately due and payable, without presentment, demand, protest or further

- 4 -

**Exhibit 2**
**Page 7 of 8**

notice of any kind, all of which are expressly waived by PRI, and/or (iii) exercise any or all rights, powers and remedies available to Calbag under this Agreement, under the Approval Order and/or at law or in equity.

**Calbag  Metals Co.**                    **Pacific Recycling, Inc.**

**By:** _____        **By:** _____
     Name:_____                 Name:_____
     Title:_____                 Title:_____

notice of any kind, all of which are expressly waived by PRI, and/or (iii) exercise any or all rights, powers and remedies available to Calbag under this Agreement, under the Approval Order and/or at law or in equity.

**Calbag  Metals Co.**

**Pacific Recycling, Inc.**

**By:** _____

**By:** _____

    Name:_____

    Name:_____

    Title:_____

    Title:_____

**Exhibit 1**
**Page 5 of 5**

**CERTIFICATE OF SERVICE**

I certify that on September 15, 2015, I served or caused to be served the foregoing

**NOTICE OF *FINAL* HEARING ON MOTION TO OBTAIN CREDIT** and **DEBTOR'S**

**MOTION FOR ORDER AUTHORIZING SECURED CREDIT** via the **COURT'S ECF**

**SYSTEM**.

I also certify that I served or caused to be served the foregoing document by **MAILING** a

full, true and correct copy thereof in a sealed, postage-paid envelope, to the members of the

secured creditors committee and other interested parties, addressed as shown below, and

deposited with the U.S. Postal Service at Portland, Oregon, on the date set forth below:

| | |
|---|---|
| Office of the United States Trustee<br>405 E 8th Avenue #1100<br>Eugene, OR 97401-2706 | Pacific Recycling, Inc.<br>3300 Cross Street<br>PO Box 2633<br>Eugene, OR 97402 |
| Dorman Construction, Inc.<br>Attn: Steve Dorman<br>303 S 5th Street #135<br>Springfield, OR 97477 | HMS Trading International, LLC<br>Attn: Lisa Li<br>PO Box 403<br>Corte Madera, CA 94976 |
| Ideal Steel<br>Attn: Sarah Coffman<br>90693 Link Road<br>Eugene, OR 97402 | Strategic Funding Source, Inc.<br>1501 Broadway, Suite 360<br>New York, NY 10036 |
| VFI KR SPE I LLC<br>6340 South 300 East, 4th Floor<br>Salt Lake City, UT 84121 | |

DATED this 15th day of September, 2015.

CABLE HUSTON LLP

By: /s/ Laura J. Walker
Laura J. Walker, OSB No. 794329
Donald J. Koehler II, OSB No. 130313
Of Attorneys for Debtor

4847-7928-4519, v. 1

Page 1 – **CERTIFICATE OF SERVICE**